## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ALEXANDRA WOOD & JORDAN WRIGHT,** | § § § | |
| | § | **CIVIL ACTION NO. 6:23-CV-00096-JCB** |
| **Plaintiffs,** | § § | |
| | § | |
| **v.** | § | |
| | § | |
| **PRISCILLA MEJIA,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the court is Defendant Priscilla Mejia's ("Defendant") motion for summary judgment. (Doc. No. 33.) Plaintiffs Alexandra Wood and Jordan Wright ("Plaintiffs") have filed a response (Doc. No. 35) to which Defendant has filed a reply (Doc. No. 38). For the reasons stated herein, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 33) be **GRANTED-IN-PART** and **DENIED-IN-PART** as set forth herein.

## BACKGROUND

On February 19, 2023, Plaintiffs filed this civil action pursuant to 42 U.S.C. § 1983 alleging a violation of the Fourteenth Amendment against Defendant Priscilla Mejia and several unidentified defendants ("DOES 1-10"). (Doc. No. 1.) Defendants initially filed a motion to dismiss asserting the defense of qualified immunity on April 17, 2023. (Doc. No. 7.) Thereafter, the court denied the motion as to Defendant Mejia, but granted the motion as to DOES 1-10 and accordingly dismissed the unidentified defendants from this action. *See* Doc. Nos. 17, 23. The court then set this matter on a schedule limiting discovery to the issue of qualified immunity and

1

setting a summary judgment deadline. (Doc. No. 27.) Pursuant to the scheduling order, Defendant Mejia filed the instant motion for summary judgment asserting that she is entitled to qualified immunity. (Doc. No. 33.)

### I.    The Parties' Pleadings

#### a.    Plaintiffs' Complaint

Plaintiffs' claims relate to the removal of their two children on January 6, 2022. *Id.* at ¶ 11. Specifically, Plaintiffs allege that on January 6, 2022, believing KRW, their two-year-old child, may have ingested medicine that father Jordan Wright dropped on the floor, Plaintiffs rushed KRW to the emergency room along with their then-seven month old child, EMW. *Id.* at ¶¶ 4, 9. Once there, Plaintiffs insisted on drug testing KRW, despite KRW initially not showing any signs of ingestion. *Id.* at ¶ 9. Eventually, KRW began showing signs of ingestion, as he appeared drowsy and was vomiting, and the treating physician decided to keep the child for overnight observation. *Id.* The physician informed Plaintiffs that KRW's drug test revealed that he had ingested the prescription drug, but also yielded positive results for THC and an antidepressant. *Id.* Plaintiffs insisted that they did not use marijuana or take antidepressants and that the test results must be wrong. *Id.*

After KRW was admitted to the hospital, Wright took EMW to his brother's house for the evening. *Id.* When he returned to the hospital, Defendant Mejia, a social worker for the Texas Department of Family and Protective Services (DFPS), was talking to Wood about what happened with KRW. *Id.* at ¶¶ 5, 9. After this conversation, Defendant Mejia removed KRW from Plaintiffs' custody and Plaintiffs were escorted from the hospital by police. *Id.* at ¶¶ 9–10. Defendant Mejia then went to Wright's brother's house and removed EMW. *Id.* at ¶ 11. Plaintiffs allege that their children were removed without a court order. *Id.* They also allege that exigent circumstances did

not justify the removal because there was no immediate threat of physical abuse, as KRW was safe in the hospital and EMW was at Wright's brother's house for the night. *Id.* at ¶ 11. Plaintiffs assert that the next day, Defendant Mejia sought an emergency removal order from state court, which was denied. *Id.* at ¶ 13. Defendant Mejia then called Plaintiffs and informed them they could pick up their children. *Id.* Plaintiffs allege that after the court denied her emergency removal request, Defendant Mejia kept the case open and her supervisor, one of the Unidentified Defendants, approved her request to enroll Plaintiffs in family services based on domestic violence. *Id.* at ¶ 14. The state court denied her motion to participate in family services and Defendant Mejia eventually closed the case. *Id.* Based on these facts, Plaintiffs allege that Defendant Mejia violated their right to due process under the Fourteenth Amendment to the United States Constitution.

### b. Defendant's Answer

In her answer, Defendant Mejia denies that she acted in a manner that violated Plaintiffs' right to due process. *Id.* at ¶¶ 4–24. She further alleges immunity pursuant to the Eleventh Amendment, as well as affirmative defenses of qualified immunity, statute of limitations, and limitations on damages. *Id.* at ¶ 4–5.

### II.    The Parties' Summary Judgment Contentions

Defendant Mejia argues that she is entitled to qualified immunity because Plaintiffs cannot show a violation of a clearly established substantive due process right, nor can they show a violation of a clearly established procedural due process right, and no other constitutional claims are alleged. (Doc. No. 33, at 9–18.) Plaintiffs' response does not address Defendant's assertion of qualified immunity with respect to a substantive due process claim. Regarding Plaintiffs' procedural due process claim, Plaintiffs argue that the law was clearly established before January 6, 2022, that the government may not seize a child absent a court order, parental consent,

or exigent circumstances. (Doc. No. 35, at 8.) Therefore, Plaintiffs argue that because Defendant Mejia removed the children without a court order, parental consent, or exigency, she is not entitled to qualified immunity. *Id.* at 8–12.

### III.    Legal Standard for Summary Judgment

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

### IV.    Defendant's Summary Judgment Evidence

In support of her motion for summary judgment, Defendant Mejia submits her declaration (Doc. No. 33-1, at 3–4); hospital records (Doc. No. 33-1, at 5–23); the investigation report (Doc. No. 33-1, at 24– 94); the deposition of Defendant Mejia from October 30, 2023 (Doc. No. 33-1, at 95 –110); and state court proceedings (Doc. No. 33-1, at 111–27). A discussion of relevant

evidence is contained below in the court's analysis; however, a summary of relevant records is discussed below.

### a.  Declaration of Priscilla Mejia

In her declaration, Defendant Mejia states that she is employed by DFPS, and that at the time of the alleged events she was a Child Protective Services Investigator. (Doc. No. 33-1, at 3.) Defendant Mejia states that she was assigned this case after hospital staff called DFPS. *Id.* Defendant Mejia states that the hospital staff expressed concerns to her about the safety of KRW if he returned to the care of his parents. *Id.* Defendant Mejia states that she told medical staff that KRW's parents informed her that someone at the hospital told them another drug test could be performed to verify the three positive results of the first drug test, but that the doctor she spoke to about this told her that another drug test was unwarranted. *Id.* Defendant Mejia states that she relied on all of this information when making her recommendation. *Id.*

Defendant Mejia refers to her investigative report and states that she relied on the facts therein when making her recommendations to DFPS. *Id.* at 4. Defendant Mejia states that Plaintiffs' criminal records were compiled in accordance with the authority provided to DFPS by law and that she did not base her recommendation on Plaintiffs' criminal histories. *Id.* Defendant Mejia states that her recommendation mostly pertained to the credibility of Mr. Wright and the truthfulness of his story about how KRW swallowed methadone and tested positive for two other drugs. *Id.* Finally, Defendant Mejia states that she does not recommend removing a child from the custody of their parents without careful thought and that she would never remove a child from a hospital against the advice of doctors—noting that she did not remove KRW from the hospital until hospital staff discharged him on January 7, 2022. *Id.*

### b.  Hospital Records

The hospital records indicate that KRW was originally seen at CHRISTUS South Tyler emergency department at 2:41 P.M. on January 6, 2022. (Doc. No. 33-1, at 16.) The records indicate that KRW was being seen for possible ingestion of methadone. *Id.* The emergency room physician, Dr. Alonso Osorio-Giraldo, noted the following:

> Dad takes 75mg of [methadone]…reports he went to take his prescribed dose and when he turned around [KRW] was holding the bottle. [Plaintiffs] got [KRW] to throw up and did not notice the pink liquid in the emesis so they are unsure if he actually ingested any of the medicine or if he just picked up the bottle. [KRW] is awake, running around, acting like his normal self.

Possible ingestion was noted to have occurred around 2:00 P.M. on January 6, 2022. *Id.* Poison control was contacted and recommended initial monitoring for four hours. *Id.* at 18. At 4:21 P.M. KRW vomited once, after having had 4 bottles of juice. *Id.* At 4:31 P.M., KRW was reevaluated, and it was noted that he was getting sleepy, his pupils were dilated, and he was drowsy. *Id.* Poison control was contacted again and recommended that since KRW was now symptomatic 2.5 hours after ingestion, that he be monitored overnight. *Id.* at 22. Tyler police arrived at the bedside of KRW at 4:43 P.M. *Id.* at 16. Urinalysis collected at 4:54 P.M. showed positive values for cannabinoids, tricyclic ("TCA") antidepressant, and methadone. *Id.* at 20. Around the same time, Dr. Pitts, a pediatrician at CHRISTUS Mother Frances Tyler Hospital, accepted KRW for admission to that facility. *Id.* at 22. At 5:05 P.M. KRW was given Narcan and an IV was placed for critical care treatment. *Id.* at 19. Dr. Osario-Giraldo noted that Plaintiffs were defensive about the need to do a case report to CPS, that they stated it was an accident, were frustrated, tearful, anxious and upset, but understood his medical concerns and wellness protection on behalf of their son. *Id.* At 5:40 P.M., a nurse contacted CPS by phone and spoke with a caseworker named Tuesday. *Id.* at 15, 18. At 6:27 P.M., the same nurse contacted Defendant Mejia, who was the CPS officer assigned to the case. *Id.* at 15.

KRW was then transferred to the pediatric floor of CHRISTUS Mother Frances Hospital in Tyler. *Id.* at 9. The notes of Dr. Eileen Neff indicate that at 9:11 P.M. on January 6, 2022, KRW was alert, active, and wanting to eat and drink. *Id.* Tyler police and CPS were present upon arrival and RN "Joe" reported that TCA and cannabinoid screens were positive. *Id.* Poison control was contacted and provided instructions on care and noted that numerous medications (like Benadryl) can cause a false positive for TCA. *Id.* KRW was removed from parent custody by CPS at 10:15 P.M. on January 6, 2022. *Id.* at 23.

Dr. Pitts saw KRW the following day, on January 7, 2022, at 10:16 A.M. *Id.* at 9. The records state that KRW was diagnosed with accidental drug ingestion, TCA overdose, opiate overdose, and poisoning by cannabis. *Id.* at 5, 9. Dr. Pitts's notes from that morning state:

> It is highly irresponsible for a young child to be near any medications, especially drugs which have such dangerous side effects. The fact that the child was placed in such a situation requires immediate intervention by appropriate state agencies, such as child protective services, and law enforcement.

*Id.* at 10. Dr. Pitts's notes further state that he discussed the case with the CPS caseworker, who was at KRW's bedside, and with Defendant Mejia over the phone. On January 7, 2022, KRW was discharged to Defendant Mejia at approximately 1:27 P.M. *Id.* at 9. Defendant Mejia was present at bedside for discharge, had already picked up medications, and understood and agreed with the plan of care and discharge. *Id.*

### c. Investigation Report

Defendant Mejia's investigation report indicates that Defendant Mejia first made contact with hospital staff and Tyler police at Christus Hospital in Tyler by telephone on January 6, 2022, between 6:00 P.M. and 7:00 P.M. (Doc. No. 33-1, at 55.) Defendant Mejia confirmed the basic intake information and was told that Plaintiffs adamantly denied any marijuana or prescription drug use. *Id.* At 9:15 P.M., Defendant Mejia arrived at the hospital and spoke with a Tyler police

officer who said that Wright had left the hospital with EMW because she could not stay there. *Id.* At 9:30 P.M., Defendant Mejia met in person with Wood at the hospital. *Id.* Wood indicated that Wright had taken EMW to their paternal uncle's house to stay the night. *Id.* Wood admitted that she and Wright had a previous negative CPS history due to drug abuse but denied any recent drug use. *Id.* Wood indicated that she was not present in the room when KRW ingested the medicine, and that Wright would be able to give better details about what happened when he returned from dropping off EMW. *Id.* Defendant Mejia explained to Wood that a safety plan would need to be put in place because of the concern that the children were being exposed to marijuana and left unsupervised around prescription medication. *Id.* Wood said she believed her sister-in-law, Anveya Wright, would be able to take the children if necessary until she and Wright could submit to a drug test. *Id.*

On January 6, 2022, Defendant Mejia contacted Anveya Wright, the paternal aunt, by telephone. *Id.* at 45. Anveya indicated that she would be willing to host the children at her home and that she has no CPS or criminal history and no major health issues. *Id.* However, the report shows that Anveya's husband, Jacob Wright, had prior arrests for assault with a deadly weapon and indecent exposure, and a prior negative CPS history due to inadequate supervision of a child who was sexually abused. *Id.* Defendant Mejia indicated to Anveya that the children could not stay in her home due to Jacob Wright's prior history. *Id.* at 46. When Defendant Mejia asked Anveya if she would be willing to stay with the children at Wood and Wright's home, Anveya hesitated to answer and said she was not sure. *Id.*

When Wright returned to the hospital, he met with Defendant Mejia in person and explained how KRW had come to ingest the medicine. *Id.* Wright said that he was mixing his prescription for methadone in the bathroom and was briefly distracted when KRW grabbed the

syringe. *Id.* Wright said that they immediately took KRW to the ER to make sure he was okay. *Id.* Wright stated that he is not prescribed any medication for depression or other mental illness and that he does not use marijuana. *Id.*

Defendant Mejia then spoke with her on-call supervisor, Daniel Raschke, who advised to proceed with removing the children. *Id.* Defendant Mejia returned to Plaintiffs and explained that the paternal aunt and uncle would not be a viable placement for the children. *Id.* When Wright stated that they have other family members who could assist, the investigation report says Mejia told Wright that Wood had told Mejia that they did not have anyone appropriate. *Id.* Defendant Mejia provided a notice of removal form for Plaintiffs to sign, but they refused to sign and would not leave the room. *Id.* Wright became agitated but calmed down after Plaintiffs were told that if they did not leave the hospital, they would be criminally trespassing. *Id.* Defendant Mejia went to pick up EMW from Anveya Wright's home that night. *Id.* The report states that Defendant Mejia arrived with EMW at the Canton CPS Office around 11:30 P.M. *Id.* at 47.

On January 7, 2022, at 8:41 A.M., Wood sent a text message to Defendant Mejia with contact information for Wood's sister, Tory Wood, stating that Tory would be willing to assist with placement. *Id.* at 50. At 10:00 A.M., Defendant Mejia spoke with Tory Wood, the maternal aunt, over the phone. *Id.* Tory said that she could host the children at her home. *Id.* However, the report shows that Tory also had a prior negative CPS history for failure to protect her one-year-old child from her ex-husband, who allegedly engaged in drug-seeking behavior and was physically and verbally abusive to the child. *Id.* When Defendant Mejia asked if Tory would be willing to relocate with the children, Tory said she would prefer not to. *Id.*

On January 7, 2022, at approximately 12:00 P.M., Defendant Mejia picked up KRW from the hospital for discharge and transported KRW and EMW to their foster placement. *Id.* at 51–52.

At 1:54 P.M., Defendant Mejia received an email from MacKenzie Ridgle, Henderson County Assistant County Attorney, stating that the judge had denied their request for an emergency protection order but had directed DFPS to file an order to participate in family-based safety services. *Id.* at 51. At 2:15 P.M., Defendant Mejia had a conference call with two CPS supervisors and Ms. Ridgle to discuss the safety plan until the drug test results for the parents came back. *Id.* Defendant Mejia returned KRW and EMW to their parents at the Athens CPS Office on January 7, 2022, at 4:45 P.M. Defendant Mejia explained to Plaintiffs that although the judge had denied the protection order, he had directed DFPS to file an order to participate in family-based safety services. *Id.* Plaintiffs disagreed but stated that they understood and signed a medical release for Defendant Mejia to obtain theirs' and the children's medical records.

The report states that on January 10, 2022, at 3:19 P.M., Wood sent Defendant Mejia the results of a drug urinalysis test performed by KRW's pediatrician, which came back negative for any illegal substances. *Id.* at 52. Further, on January 7, 2022, Plaintiffs submitted urine samples for drug testing, which came back negative for any illegal substances. *Id.* at 54. However, the report also states that Plaintiffs submitted hair follicle samples for drug testing, which both came back positive for marijuana. *Id.* at 56. The report does not state when the hair follicle samples were collected or analyzed.

On January 11, 2022, Defendant Mejia met Plaintiffs and the children at their home. *Id.* at 54. Defendant Mejia explained that the judge had ordered the parents to participate in family-based safety services. *Id.* The report states that Defendant Mejia observed that KRW and EMW were clean and appropriately groomed, did not have any marks or bruises indicative of abuse or neglect, and did not appear to be in distress. *Id.* at 55.

The report also details the children's medical history records, including the doctor's and nurse's notes regarding KRW's condition and treatment plan on January 6, 2022. *Id.* at 58–61. However, the report does not provide any other relevant information about the children's medical history or the events on January 6 from the perspective of medical staff that is not already discussed hereinabove. *See id.*

### d. Deposition Transcript of Priscilla Mejia

Defendant Mejia has included relevant excerpts from her deposition that occurred on October 30, 2023. (Doc. No. 33-1, at 95–110.) The deposition testimony will be further discussed herein as relevant.

### e. State Court Records

Defendant has included the state court records, which includes the original petition for protection of a child, for conservatorship, and for termination in-suit of parent-child relationship, and the attached affidavit of Defendant Mejia in support of removal. (Doc. No. 33-1, at 111–27.) The documents indicate that the petition was filed in the District Court of Henderson County at 10:10 A.M. on January 7, 2022. *Id.* at 111. Defendant Mejia's affidavit contains the information that was known to her and which was discussed above—namely that KRW's urine drug screen was positive for cannabinoids, TCA, and methadone, that KRW allegedly got into the methadone while his father was taking his prescribed dose and became briefly distracted, and that KRW showed signs of methadone ingestion at the emergency room, including vomiting and drowsiness. *Id.* at 124–25. The affidavit also includes the criminal histories of Plaintiffs. *Id.* at 126.

### V.    Plaintiffs' Summary Judgment Evidence

In support of their opposition to summary judgment, Plaintiffs include deposition excerpts (Doc. No. 35-1); an affidavit of Alexandra Wood (Doc. No. 35-2); an affidavit of Jordan Wright

(Doc. No. 35-3); an affidavit of Jacob Wright (Doc. No. 35-4); and an affidavit of Ed Rose (Doc. No. 35-5).

### a. Affidavit of Alexandra Wood (Doc. No. 35-2)

In her declaration, Ms. Wood, mother of KRW, states that on January 6, 2022, she and her husband, Jordan Wright believed that their son KRW may have accidentally ingested some of Jordan Wright's medicine, so they immediately grabbed both of their children and went to the emergency room for evaluation. (Doc. No. 35-2, at 1.) Ms. Wood states that they informed medical staff that they did not see him ingest the medicine but knew it was a possibility because the medicine was gone. *Id.* Ms. Wood states that the ER doctor informed them that KRW did not have signs of ingestion and that they were going to monitor him. *Id.* at 2. Ms. Wood states that they requested a urine test be done and the doctor agreed. *Id.* Ms. Wood states that KRW then became drowsy and started to vomit. *Id.* at 2. The doctor indicated that they would keep KRW overnight for observation, and so Plaintiffs planned to spend the night at the hospital. *Id.* at 2.

Ms. Wood states that the doctor informed them that KRW did ingest a small amount of medicine but failed to tell them that KRW also tested positive for marijuana and an antidepressant until 5:47 P.M. *Id.* Ms. Wood states that she told the doctor those results could not be accurate because they do not smoke marijuana and are not prescribed antidepressants, and that KRW was taking Benadryl for a head cold. *Id.* The doctor informed them that some medications do cause false positives; he recommended that another test be done at the hospital before the time of discharge. *Id.* Ms. Wood states that then Tyler police entered the room and told them the results and that CPS was going to get involved. *Id.* Ms. Wood indicated that they were understanding at the time and that she rode in the ambulance with KRW to the main hospital while Jordan took their other child, EMW, to his brother's house for the night. *Id.* at 2–3.

Ms. Wood indicates that before her husband arrived at the main hospital, Defendant Mejia came into the hospital room, introduced herself, and asked Ms. Wood about what happened, as well as other questions. *Id.* at 3. Ms. Wood states that she told Defendant Mejia about the suspected ingestion, that they then rushed KRW to the ER, and that she was not a drug user and had had not smoked marijuana in many years—since she was a teenager. *Id.* Ms. Wood states that she also told Defendant Mejia that KRW was on Benadryl for a cold and gave Defendant Mejia her sister-in-law's phone number. *Id.*

Ms. Wood states that at 9:02 P.M. on January 6, 2022, Defendant Mejia informed Plaintiffs that DFPS was going to remove the children without even first talking to her husband Jordan about what had happened. *Id.* Ms. Wood stated that they were panicking because their children have never been away from them; they asked if the children could be placed with a family member, but Defendant Mejia told them "no that would not work." *Id.* at 4. Ms. Wood also states that she asked Defendant Mejia if someone could come and supervise them until the investigation was completed. *Id.* Defendant Mejia responded that she believed KRW was in danger and then told the police officers to escort Plaintiffs off the premises. *Id.* Ms. Wood says that they pleaded with Defendant Mejia for any other option; they offered to take a drug test on the spot, informed her they would spend the night with their child, and told her that the previous doctor indicated that false positives can be caused by Benadryl, which KRW was taking for a head cold. *Id.* Ms. Wood indicated that Defendant Mejia went forward with the plan to remove both children. *Id.* Ms. Wood states that Plaintiffs were devastated and distraught all night, continuing to contact Defendant Mejia. *Id.* at 5. Ms. Wood states that they got up at 7 A.M. to go take drug tests so that they could prove they were not drug users and get their children back. *Id.*

Ms. Wood states that at 5:30 P.M. on January 7, 2022, Defendant Mejia called them to tell them to meet her at the CPS office to pick up their children because a judge had determined that DFPS has no valid reason to remove the children and ordered them returned to their parents. *Id.* Ms. Wood states that upon picking up their children, Defendant Mejia stated "that she was remorseful for not giving Jordan a chance to speak on behalf of the children before the removal and admitted that there were many alternatives that could have been done rather than removing the children such as placing the children with a family member or a safety plan in place to ensure the children's safety." *Id.*

Ms. Wood states that they immediately did a home drug test on KRW and the results were negative. *Id.* at 6. They then took KRW to his pediatrician on Monday January 10, 2022, who also tested KRW for drugs, which came back negative. *Id.* Ms. Wood states that Defendant Mejia asked for her sister-in-law to stop in as a safety monitor and that on January 25, 2022, they received a notice that the case was being dismissed and that the safety plan was no longer in place. *Id.* Plaintiff states that there was a hearing on February 11, 2022, in front of Judge Keith Downs where all facts were presented, and that the court found that there was no continuing danger to the children and closed the case on February 15, 2022. *Id.*

### b. Affidavit of Jordan Wright (Doc. No. 35-3)

Mr. Wright, father of KRW, states that on January 6, 2022, he began to take medication as prescribed by his physician, and as he was preparing his dose, he turned to take a call from his employer. (Doc. No. 35-3, at 1.) Mr. Wright states that he turned only to answer his phone, and as soon as he turned back, the dose of medicine was gone and KRW said "medicine daddy." *Id.* Mr. Wright states that he tried to stick his finger down KRW's throat to induce vomiting, but was not successful so he immediately took him to the nearest ER for evaluation. *Id.* at 2. Mr. Wright

similarly conveys that they told medical staff that they did not see KRW ingest the medicine and that the doctor stated KRW did not appear to be showing signs of ingestion, but that he would be held for observation. *Id.* Mr. Wright states that he and Ms. Wood asked for a drug test for KRW and then KRW started getting drowsy and vomited. *Id.* At that point, Mr. Wright states that the doctor informed him that they would keep KRW overnight for observation. *Id.*

Mr. Wright states that the doctor informed them that KRW did ingest a small amount of medicine but failed to tell them that KRW also tested positive for marijuana and an antidepressant until 5:47 P.M. *Id.* Mr. Wright states that he told the doctor the drug test results could not be accurate because they do not smoke marijuana, that they are not prescribed antidepressants, and that KRW was taking Benadryl for a head cold. *Id.* The doctor informed them that some medications do cause false positives; he recommended that another test be done at the hospital before the time of discharge. *Id.* Ms. Wright states that then Tyler police entered the room and told them the results and that CPS was going to get involved. *Id.* Mr. Wright indicated that they were understanding at the time and his wife rode in the ambulance with KRW to the main hospital while he took their other child, EMW, to his brother's house for the night. *Id.* at 2–3.

Mr. Wright states that when he returned from dropping off EMW with his brother, he was informed that his children were being removed by CPS. *Id.* at 3. Mr. Wright states that he was overwhelmed with fear, anxiety, and confusion. *Id.* They asked Defendant Mejia if the children could be placed with a family member while CPS conducted their investigation, to which Defendant Mejia responded, "that would not work." *Id.* He states that they also requested that someone come into the home and supervise them during the investigation, but that Defendant Mejia refused that request and asked police officers to escort them off the premises. *Id.* Mr. Wright states that he let Defendant Mejia know that the previous doctor stated a second test should be

done because certain medications can cause false positives, but she ignored that request. *Id.* Mr. Wright states that Defendant Mejia then removed both KRW and EMW. *Id.*

Mr. Wright states that Plaintiffs were lost, sad, and confused. *Id.* at 4. They woke up at 7 A.M. on January 7, 2022, to take a drug test to prove that they were not on drugs. *Id.* Mr. Wright indicates that they continued to make additional requests to get their children back but were told that "it's not going to happen." *Id.* Thereafter, Mr. Wright states that at 5:30 P.M. on January 7, 2022, Defendant Mejia called to tell them to meet her at the CPS office to pick up their children because a judge had determined that DFPS has no valid reason to remove the children and ordered them returned to their parents. *Id.* Mr. Wright states that on January 10, 2022, Ms. Wood took KRW to his pediatrician for additional drug urinalysis; the results came back that same day negative for any controlled substances. *Id.* Mr. Wright states that his child was traumatized by the entire incident and contends that Defendant Mejia failed to conduct a proper investigation before removing the children. *Id.*

### c.  Affidavit of Jacob Wright (Doc. No. 35-4)

Jacob Wright, brother of Jordan Wright, states that on January 6, 2022, he received a call from his brother Jordan that he and his wife were at the hospital with KRW and that he was being kept overnight for observation. (Doc. No. 35-4, at 1.) He asked if he needed to come pick up EMW, but Jordan said he would bring EMW to him and then showed up at his house with EMW and an overnight bag. *Id.* at 1–2. Jacob states that approximately 45 minutes later, he received a call from Defendant Mejia stating that she was doing an investigation, confirming EMW was at his house, and asking whether they would be willing to be a placement option for the children. *Id.* Jacob stated that, absolutely yes, they would. *Id.* Jacob states that approximately five minutes later, Defendant Mejia called back and stated that they did not meet the requirements for placement and

an officer would come pick up EMW. *Id.* Jacob states that he now understands the reason for that decision was his record of arrest for a firearm and indecent exposure, from when he discharged a firearm in the air when he was much younger and "mooned" a student on the bus when he was 12 years old. *Id.*

Jacob states that he and his wife pleaded with Defendant Mejia to let EMW stay the night, as she was already sound asleep, but that Defendant Mejia stated that she could not let that happen. *Id.* Defendant Mejia arrived at 9:30 to pick up EMW. *Id.* Jacob states that Defendant Mejia threatened him, saying that she had a deputy there to assist and they would be in trouble with the police if they tried to stop the removal. *Id.* at 3.

### d. Deposition Transcript of Priscilla Mejia

Plaintiffs have also included relevant excerpts from the deposition of Priscilla Mejia that occurred on October 30, 2023. (Doc. No. 35-1.) The deposition testimony will be further discussed herein as relevant.

## DISCUSSION

## I.    Qualified Immunity

The doctrine of "qualified immunity" protects government officials from "liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982). The qualified immunity inquiry determines whether a plaintiff has shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). The court has "discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An additional consideration exists in the analysis of a qualified immunity defense on a motion for summary judgment. Once a defendant invokes qualified immunity, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (internal citation omitted). Thus, although the court "draws all factual inferences in favor of the non-movant, . . . once the issue of qualified immunity is raised, the non-movant (*i.e.* the plaintiff in this case) bears the burden of rebutting the defense." *See Est. of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) ("[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("the plaintiff bears the burden of negating qualified immunity…"). "The plaintiff can defeat summary judgment by rebutting the qualified immunity defense as a matter of law or by raising a genuine fact dispute that is material to the issue of immunity." *Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *4 (E.D. Tex. Dec. 28, 2015), *report and recommendation adopted*, No. 9:14-CV-144, 2016 WL 165091 (E.D. Tex. Jan. 14, 2016) (citing *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)). "[S]ummary judgment should be denied if the plaintiff's version of the facts would permit a finding that the official is not entitled to qualified immunity." *Id.* (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 418 (5th Cir. 2009)).

As discussed above, Plaintiffs allege that Defendant Mejia violated their substantive due process right to familial association under the Fourteenth Amendment, as well as a Fourteenth Amendment violation of procedural due process.

### i. Substantive Due Process

19

Defendant Mejia moves for summary judgment on qualified immunity on Plaintiffs' Fourteenth Amendment substantive due process claim. (Doc. No. 33, at 10–12.) Plaintiffs' response focuses primarily on procedural due process but does cite to substantive due process cases and fails to explicitly state whether they intend to continue to assert a substantive due process claim. (Doc. No. 35, at 7–8.) The same was unclear from Plaintiffs' original complaint. In the initial report and recommendation adjudicating Defendant Mejia's motion to dismiss for failure to state a claim, the court found that "Plaintiffs' allegations concern their Fourteenth Amendment right to procedural due process; thus, the court will not address Mejia's arguments concerning substantive due process." (Doc. No. 17, at 4, n.1.) Neither party objected to the report and recommendation on these grounds. While the allegations primarily deal with procedural due process, to the extent it can be interpreted that Plaintiffs have also asserted a claim for a violation of substantive due process, the court considers such a claim now on summary judgment.

The Fourteenth Amendment to the Constitution of the United States guarantees, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. 28 U.S.C. § 1983 provides a cause of action against an individual who, acting under color of state law, has deprived a person of a federally protected statutory or constitutional right. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 426 U.S. 40, 49–50 (1999). The Supreme Court has referred to the "interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The protected liberty interest guaranteed by the due process clause of the Fourteenth Amendment has been found to include "rights to conceive and to raise one's children" and to maintain the "integrity of the family unit." *Morris v. Dearborne*, 181 F.3d 657, 666-67 (5th Cir. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 (1972)). This right

has also been described as "the right of the family to remain together without the coercive interference of the awesome power of the state." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988). "The right, however, is not absolute" as states have "an interest in adopting necessary policies to protect the health, safety, and welfare of children," and those competing rights must be balanced. *McCullough v. Herron*, 838 F. App'x 837, 841–42 (5th Cir. 2020) (citing *Morris*, 181 F.3d at 669; *Wooley v. City of Baton Roug*e, 211 F.3d 913, 924 (5th Cir. 2000)).

Whether Defendant Mejia violated Plaintiffs' substantive due process right to family integrity can be answered by assessing whether Defendant Mejia's individual actions were "arbitrary or conscience shocking on the continuum between private and state interests." *McCullough*, 838 F. App'x at 842; *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012). On the record before it, the court finds that Defendant Mejia's actions were not.

Here, Defendant Mejia removed the children from the custody of their parents after she became aware that KRW had shown signs of ingesting methadone in the ER and his urine specimen returned positive results for methadone, cannabinoids, and TCA. (Doc. No. 33-1, at 24–25, 4, 13.) This information formed the basis of Defendant Mejia's recommendation presented to the court as to what she was aware of at the time. *Id.* at 124–25. Nothing in the record before the court supports the notion that Defendant Mejia intentionally lied, misrepresented the facts, or fabricated evidence before the court. *See McCullough,* 838 F. App'x at 843 (affirming summary judgment where the record did not include any evidence of the predicate conscience-shocking behavior needed to support a substantive due process claim); *see also Rogers v. Lee Cnty., Miss.*, 684 F. App'x 380, 390 (5th Cir. 2017) (affirming a district court's grant of summary judgment on a substantive due process claim where evidence showed state actors "demonstrate[d] at most negligence or

incompetence rather than a conscience-shocking intent to lie about, misrepresent, or fabricate evidence"). Even to the extent it can be suggested that Defendant Mejia should have done more before removing the children from the custody of their parents, such as requesting another drug test, this conduct is not "arbitrary or conscience-shocking."

Thus, Defendant Mejia is entitled to qualified immunity on Plaintiffs' substantive due process claim because the record does not raise a genuine issue of material fact regarding the deprivation of a protected liberty interest. However, even if Plaintiffs had set forth sufficient evidence to raise a question regarding their substantive due process claim, Defendant Mejia would still be entitled to qualified immunity in this case because precedent does not establish the violation of a clearly established right.

The existence of "clearly established" law is a question for the court. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). The focus of the inquiry is whether the officer "had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Although the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 1152 (internal quotation marks omitted) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). The "salient question" is whether the state of the law at the time of defendants' conduct gave them fair warning that plaintiff's alleged treatment was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers. . . ." *White*, 137 S. Ct. at 552 (internal quotation marks omitted) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

However, courts must not "define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152. The Supreme Court has described qualified immunity as protecting "all but the plainly incompetent or those who knowingly violate the law." *Id.*

Here, there are no similar cases finding substantive due process liability. To the contrary, the Fifth Circuit has found that analogous circumstances did not violate clearly established law in *Romero v. Brown*. 937 F.3d 514 (5th Cir. 2019). In *Romero*, seven children were removed from their parents' custody by the state without a court order when there was believed to be domestic violence for which DFPS had an open investigation. *Id.* at 518–19. The day following removal of the children, a court hearing was held to determine if warrantless removal was justified and the court ordered the children returned home. *Id.* at 519. The children were then returned home, with the entire removal lasting approximately one day. *Id.* The Fifth Circuit found that foundational family integrity cases "involved the state's attempt to sever permanently the parent-child relationship." *Id.* at 521 (citing *Hodorowski*, 844 F.2d at 1216; *Santosky v. Kramer*, 455 U.S. 745 (1982); *Stanley*, 405 U.S. 645). The court went on to note that cases since have found clear violations of substantive due process only when the children were removed for months or years. *Id.* (citing *Wooley*, 211 F.3d at 918 (finding violation when mother lost custody of her child for approximately three months); *Morris*, 181 F.3d at 671 (finding violation when child was placed in foster care for three years and cut off from all contact with her father during that time)). Ultimately, the court concluded that the defendant welfare officer was entitled to qualified immunity because there was no similar case finding substantive due process liability involving a short, one-day removal of children combined with the welfare officer's ongoing investigation into domestic violence. *Id.*

In this case, KRW and EMW were removed from the custody of their parents for less than twenty-four hours, from approximately 10:15 P.M. on January 6, 2022 (Doc. No. 33-1, at 23, 46–47), until January 7, 2022, at 4:45 P.M (*id.* at 51). Moreover, as discussed, the removal was based upon KRW's ingestion of methadone and a urine test that resulted positive for methadone, cannabinoids, and TCA, for which there was an ongoing investigation by DFPS. *Id.* at 24–25. As a result, Defendant Mejia would not have been on notice that her conduct violated a clearly established substantive due process right to familial association. She is therefore entitled to qualified immunity on this claim.

### ii.  Procedural Due Process

Defendant Mejia also argues that she is entitled to qualified immunity on Plaintiffs' procedural due process claim. (Doc. No. 33, at 12–18.) In response, Plaintiffs argue that the law was clearly established before January 6, 2022, that the government may not seize a child absent a court order, parental consent, or exigent circumstances. (Doc. No. 35, at 8.) Specifically, Plaintiffs argue that there were no exigent circumstances justifying the removal because the children were not in any imminent danger. *Id.* at 8–12. Plaintiffs note that KRW was safe in the hospital for overnight observation and would not be discharged until the following afternoon, and EMW was safe for the night at the children's paternal uncle's house. *Id.* at 8–9. Accordingly, Plaintiffs assert that Defendant is not entitled to qualified immunity.

In addition to providing parents with substantive protection from interference with their liberty interest in the care, custody, and management of their children, the Due Process Clause also requires that the state follow certain procedures before encroaching on those parental rights. *Santosky*, 455 U.S. at 753–54; *Stanley*, 405 U.S. at 658; *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). "[F]or the qualified immunity analysis,

unlike the fuzzy continuum that governs substantive due process in this area, there are bright lines when it comes to the procedural safeguards." *Romero*, 937 F.3d at 521. The rule is clear: under the Fourteenth Amendment, a state cannot "seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates*, 537 F.3d at 429 (citation omitted). "This is the same standard that governs a child's Fourth Amendment claim for being removed from the family." *Romero*, 937 F.3d at 521 (citing *Gates*, 537 F.3d at 435).

Here, indisputably, Defendant Mejia did not have Plaintiffs' consent to remove the children from their custody, nor did Defendant Mejia have a court order for removal. Thus, Defendant Mejia's conduct is only justified if exigent circumstances existed. Exigent circumstances exist when, based on the totality of the circumstances, there is reasonable cause to believe that the children are in imminent danger of physical or sexual abuse if they remain with the parents. *Gates*, 537 F.3d at 429. In assessing whether exigent circumstances justify removal, the court considers several unenumerated factors, including: (1) "whether there was time to obtain a court order," (2) "the nature of the abuse (its severity, duration, and frequency)," (3) "the strength of the evidence supporting the allegations of abuse," (4) "the risk that the parent will flee with the child," (5) "the possibility of less extreme solutions to the problem," and (6) "any harm that might result from the removal." *Id.*; *see also Wernecke v. Garcia*, 591 F.3d 386, 398 (5th Cir. 2009) (setting out a similar multi-factor test for exigency in child endangerment context). Further, in *Romero*, the Fifth Circuit noted that "[t]he ruling of the state judge, finding no exigency to justify the removal and immediately returning the children to both parents, lends further support to a procedural due process claim[.]" 937 F.3d at 522.This inquiry is flexible, and the court takes into account the surrounding facts and circumstances, with no one factor being dispositive. *Gates*, 537 F.3d at 429.

In considering the facts of the case, the court also "pay[s] careful attention to what information was known by the [state] employees making the decision to remove the [] children." *Id.*

In the present case, the removal of the children indisputably happened after business hours, at approximately 10:15 P.M. on Thursday, January 6, 2022. (Doc. No. 33-1, at 23.) However, neither party disputes that KRW was at the hospital for overnight observation at that time, and that he would not be discharged until the following day.[1] *See* Doc. No. 33, at 16; Doc. No. 35, at 8. In her deposition, Defendant Mejia admitted that KRW was not in any immediate danger of harm at the hospital. (Doc. No. 35-1, at 78:16–24.) Objectively, the evidence shows that at the time of removal, KRW was under observation by numerous medical professionals, and law enforcement was also present, ensuring the safety of the child. *Id.* at 5–23, 44. As Defendant Mejia was present at the hospital prior to and during removal of KRW, she was aware of the fact that KRW was being kept overnight for observation, and that he was under the care of physicians and other health care professionals. *Id.* at 44. Moreover, the decision to remove KRW from custody while he was still in the hospital receiving treatment deprived Plaintiffs not only of the ability to be with their child and comfort him at that time, but also to make and understand decisions with respect to his medical care. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests). Indeed, the record reflects that only Defendant Mejia was present for discharge and that she received instructions on KRW's continued care, which included a follow-up appointment and prescription medication, but the record does not indicate what, if anything, was communicated to Plaintiffs regarding KRW's continued care. (Doc. No. 33-1, at 8–10, 50–

---

[1] The record reflects that KRW was not discharged until 1:27 P.M. on Friday, January 7, 2022. (Doc. No. 33-1, at 9.)

51.). Thus, with respect to KRW, the evidence suggests that although the removal occurred after business hours, the circumstances did not require immediate removal such that there was time to get a court order first thing the next morning (Friday, January 7, 2022) while he was still safe at the hospital.

With respect to EMW, the fact that removal occurred after business hours is not dispositive either. As discussed below, no drug test was performed on EMW, there was no other evidence that EMW was abused or neglected, and the record does not indicate that DFPS ever checked Plaintiffs' home to determine whether it was safe for EMW. Further, Plaintiffs assert that there were other less extreme alternatives to removing EMW from Plaintiffs' custody, such as placing her with another family member or allowing supervised parental custody during the investigation. (Doc. No. 35, at 9.) Defendant Mejia does not provide any reasons why these less restrictive means could not have been implemented, which is especially troubling considering the short period of time (less than 24 hours) it took to obtain a decision on emergency removal from the state court judge.

Regarding the nature of the abuse, the severity of the alleged abuse against KRW is not insignificant. Defendant Mejia was aware that KRW's urinalysis tested positive for methadone, cannabinoids, and TCA, and that KRW was taken to the ER, initially showing no signs of ingestion but eventually appearing drowsy and vomiting. (Doc. No. 33-1, at 9, 16–18.) The duration of the alleged abuse was short-lived, however. The doctor's notes from the medical records state that by 9:11 P.M. on January 6, 2022, approximately seven hours after first arriving at the ER, KRW was "alert, active and want[ed] to eat and drink." (Doc. No. 33-1, at 9.) This is corroborated by Defendant Mejia's investigation report, which states that she met with KRW at 9:30 P.M. on January 6, 2022, and does not mention that KRW appeared to be in any medical distress. *Id.* at 47. Regarding the frequency of the alleged abuse, Ms. Wood conveyed to Defendant Mejia that this

27

was an isolated incident, stating: "Jordan was going to take his dose for the day and turned his back for one second and [KRW] said medicine so that led Jordan to believe that [KRW] may have [taken] some so we rushed him to the Emergency Room just to be safe and make sure he was okay…" (Doc. No. 35-2, at 3.) Ms. Wood's statement is corroborated by the medical records and Defendant Mejia's investigation report, which Defendant Mejia admits was the information that she relied on as a basis for removal. (Doc. No. 33-1, at 10, 16.; Doc. No. 22-1, at 44; Doc. No. 33-1, at ¶ 5.) Further, Ms. Wood informed Defendant Mejia that she was not a drug user and had no recent drug use, but Ms. Wood admitted she had previous CPS history due to drug use. (Doc. No. 35-2, at 3; Doc. No. 33-1, at 44.)[2] Nonetheless, KRW's urinalysis, which also showed positive results for two other drugs (cannabinoids and TCA) would have likely led Defendant Mejia to believe that this was not an isolated incident. Thus, while Defendant Mejia was aware on the one hand that KRW had ingested Mr. Wright's methadone medication and tested positive for two other controlled substances, she was also aware, on the other hand, of the assertion that the methadone ingestion was the result of a purported momentary lapse in judgment for which Plaintiffs immediately took KRW to the emergency room, demonstrating great concern for KRW's welfare. (Doc. No. 35-3, at 2; Doc. No. 33-1, at 16–18, 44.)

As for EMW, there is no direct evidence of any drug exposure or ingestion. Defendant appears to have based her decision to remove EMW on the circumstances surrounding KRW and the fact that Plaintiffs could not provide a suitable temporary placement for EMW while they were

---

[2] Plaintiffs claim that Defendant Mejia never spoke with the children's father, Jordan Wright, about what happened prior to making the decision to remove the children. (Doc. No. 35-3, at 3). Plaintiffs further state that Defendant Mejia admitted remorse for not allowing Mr. Wright to speak on behalf of the child prior to removal. (Doc. No. 35-2, at 5.) The investigation report does not state exactly when Defendant Mejia spoke with Mr. Wright after he returned from dropping off EMW, but the report's account of their conversation precedes the report's account of her phone call with her supervisor, Daniel Rashcke, wherein they made the decision to remove the children. (Doc. No. 33-1, at 44–46.) As such, there is a genuine issue of fact about whether, and to what extent, Defendant Mejia spoke with Mr. Wright before making the decision to remove the children.

at the hospital with KRW. (Doc. No. 33, at 17.) However, this assumes that temporary placement was the only alternative to removal, which as discussed below, was not the case.

Regarding the strength of the evidence supporting abuse, prior to her decision, Defendant Mejia knew that KRW tested positive for three controlled substances, one of which is illegal, and that Plaintiffs had a prior negative CPS history due to drug use. (Doc. No. 33-1, at 9, 44.) Taken together, these facts can support an inference of inadequate supervision. *Pate v. Harbers*, No. A-15-CA-375-SS, 2015 WL 4911407, at *7 (W.D. Tex. Aug. 17, 2015), *aff'd*, 667 F. App'x 487 (5th Cir. 2016) (stating the plaintiff's past and present drug use alone were not sufficient to rise to the level of exigency, but other corroborating information suggested that the plaintiff's compromised judgment could jeopardize her child's safety). However, Ms. Wood vehemently denied any recent drug use to Defendant Mejia and claims that she provided information that would have made Defendant Mejia aware at the time of removal of the possibility that the first test produced a false positive for the other drugs. (Doc. No. 35-2, at 4; Doc. No. 33-1, at 44.) Specifically, Ms. Wood states that she told Defendant Mejia that KRW was taking Benadryl for a head cold. (Doc. No. 35-2, at 3.) The notes of the admitting physician, who saw KRW prior to removal at 9:11 P.M. on January 6, 2022, state that poison control reported that Benadryl could cause a false positive for TCA. (Doc. No. 33-1, at 9.) Thus, Plaintiffs argue that Defendant was aware of the possibility of a false positive but still chose not to seek another drug test to confirm whether the first test was a false positive for other drugs. (Doc. No. 35-2, at 4.)

Defendant Mejia agrees that Plaintiffs raised the possibility of another drug test with her to verify the results of the initial tests but states that "the doctor [she] spoke to about this told her that another drug test was unwarranted." (Doc. No. 33-1, at 3, 50.) However, Defendant Mejia's assertion is problematic in that there is no indication in the record that she spoke with a physician

regarding additional testing *prior to* making the decision to remove the children. Rather, Defendant Mejia's investigation report states that on January 7, 2022, at 9:00 A.M.—nearly twelve hours after the decision to remove the children had been made—she asked Dr. Pitts about whether another drug test would be done because Plaintiffs told her that the ER doctor had said another drug test would be performed, but that "Dr. Pitts stated there is no note in his record and that he further feels that there is no legal or medical reason for [KRW] to be retested." *Id.* at 50. To the extent that this is the doctor's statement to which Defendant Mejia's declaration refers and upon which she relied in making her decision to remove the children, it is not reflective of what Defendant Mejia knew at the time of the decision to remove. As such, the lack of a second test prior to removal undermines the strength of the evidence supporting abuse.

As for EMW, the evidence supporting the abuse of KRW may indicate that EMW was also left unsupervised around controlled substances. *Cf. Romero*, 937 F.3d at 521 ("Spousal abuse is an indicator of child abuse."); *see also Child Abuse & Neglect Risk & Protective Factors*, CTRS. DISEASE CONTROL & PREVENTION (Apr. 6, 2022) (stating other family violence, including relationship violence, is a risk factor for child abuse). But the strength of the evidence with respect to EMW is quite weak as she was not tested for drugs or observed by any medical professional to need treatment, and Plaintiffs' home was never inspected.

As to the risk of flight, the summary judgment evidence shows that the risk of flight was exceedingly low. Both parties concede that KRW was safe in the care of the hospital for overnight observation and would not be released until the following day. (Doc. No. 35, at 4; Doc. No. 33, at 16; Doc. No. 33-1, at 9, 22.) The summary judgment evidence shows that Plaintiff Wright returned to the hospital after dropping off EMW at his brother's house even though he knew by that point that a CPS investigator was planning to meet them at the hospital. (Doc. No. 33-1, at 44;

Doc. No. 35-3, at 3; Doc. No. 1, at 4.) Plaintiff Wood did not hesitate to disclose EMW's whereabouts when asked. (Doc. No. 33-1, at 44.) And Plaintiffs were generally cooperative with Defendant Mejia's initial attempts to find suitable temporary placement for the children. (Doc. No. 33-1, at 44; Doc. No. 35-3, at 3; Doc. No. 35-2, at 4.) Accordingly, when viewed in the light most favorable to Plaintiffs, the evidence shows that the overall risk of flight at the time of removal was minimal.

Regarding other less extreme solutions to removal, with respect to KRW, one less extreme alternative would have been to allow him to remain in his parents' custody at the hospital, with supervision, until the following day. Again, when the decision to remove was made on the night of January 6, 2022, Defendant Mejia knew that KRW was being kept overnight for observation. (Doc. No. 33-1, at 44.) The undisputed facts show that KRW and EMW were removed from Plaintiffs' custody the night of January 6, 2022, when Defendant presented Plaintiffs with a notice of removal and police ordered Plaintiffs to leave the hospital by threat of criminal trespass. (Doc. No. 33-1, at 46; Doc. No. 35-2, at 3–4; Doc. No. 35-3, at 3).[3] The timing of removal is also consistent with the nurse's notes from the medical records. (Doc. No. 33-1, at 23) ("Pt was removed from Parent custody by CPS at 2215 on 1-6-22[.]") As for EMW, even assuming there was no suitable temporary placement available on the evening of January 6, there is nothing in the

---

[3] In her reply to Plaintiffs' response, Defendant Mejia argues that Plaintiffs misled the court and that summary judgment is proper because Plaintiffs' complaint states that KRW was physically removed from the hospital the night of January 6, contradicting their response to Defendant's motion for summary judgment which acknowledges that KRW was not removed from the hospital until he was discharged the following day. (Doc. No. 38.) But whether KRW was physically removed from the hospital is not dispositive of whether the child was removed from Plaintiffs' custody. Plaintiffs' complaint clearly alleges, and the undisputed summary judgment evidence shows, that Defendant Mejia and the Tyler Police substantially interfered with Plaintiffs' possessory interest in KRW when Defendant Mejia presented Plaintiffs with a notice of removal and the Tyler Police ordered Plaintiffs to leave the hospital without KRW. *See* Doc. No. 1, at 5 ("Police officers at the direction of PRISCILLA removed/escorted both ALEXANDRA and JORDAN from the hospital premises."); *Troxel*, 530 U.S. at 65 (Parents have a fundamental right to the care, custody, and control of their children); *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (A seizure occurs for Fourth Amendment purposes when "there is a meaningful interference with an individual's possessory interests").

record to suggest that it would have been impossible, or even impractical, to inspect Plaintiffs' home to verify that there were no unsecured medications or illegal drugs before allowing EMW to stay the night there with her parents. Accordingly, when viewed in the light most favorable to Plaintiffs, the summary judgment evidence shows that there were several viable alternatives available to Defendant Mejia at the time of removal.

Regarding any harm to the children that might result from removal, Plaintiff Wright alleges in his affidavit that the removal traumatized KRW, and that he is scared to ever be away from Plaintiffs. (Doc. No. 35-3, at 4.) As for EMW, Plaintiffs do not allege that she has suffered any harm related to the removal. At this point in the case, the court can best conclude that KRW suffered emotional harm resulting from his removal from his parents.

Considering the totality of the factors and circumstances, Plaintiffs have presented sufficient evidence for a reasonable juror to conclude that Defendant Mejia did not have sufficient basis to believe that the children were in danger of imminent physical harm at the time of removal, thereby violating Plaintiffs' rights to procedural due process. *See Gates*, 537 F.3d at 429. Additionally, neither party disputes that the state court judge ordered the return of the children the next day, which further supports a procedural due process claim. *See Romero*, 937 F.3d at 522 ("The ruling of the state judge, finding no exigency to justify the removal and immediately returning the children to [Plaintiffs], lends further support to a procedural due process claim[.]").

Nonetheless, to survive summary judgment, Plaintiffs must also demonstrate that Defendant Mejia's conduct violated clearly established law. *See al–Kidd*, 563 U.S. at 735 (citing *Harlow*, 457 U.S. at 818). The Fifth Circuit has recently noted that precedent "does not require that the district court identify caselaw holding that an emergency child removal was specifically unconstitutional under similar circumstances, nor does it require a case directly on point." *Banks*

*v. Herbrich*, 90 F.4th 407, 415–16 (5th Cir. 2024) (citations omitted). Reasonable notice is the gravamen of qualified immunity. *Id.* (citing *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 326 (5th Cir. 2023)).

The Fifth Circuit's decisions in *Gates, Wernecke,* and *Romero* were all decided prior to the removal in this case, and all stand for the well-established law that removal without consent, a court order, or exigent circumstances violates the Fourteenth Amendment. *Gates*, 537 F.3d at 429 ("[T]he government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances."); *see also Wernecke*, 591 F.3d at 399–01 ("Fifth Circuit law clearly established in June 2005 that the warrantless seizure of the Wernecke boys—in the absence of any imminent danger—was a constitutional violation."); *Romero*, 937 F.3d at 521–22 ("It is thus clearly established that a court order or exigency is the predeprivation process that is due when social workers remove a child."). Defendant Mejia would have been on fair notice of this clearly established law in the Fifth Circuit, including the *Gates* exigency factors discussed above. *See Gates*, 537 F.3d at 429 (setting forth the following factors to assess whether exigent circumstances justified a removal (1) "whether there was time to obtain a court order," (2) "the nature of the abuse (its severity, duration, and frequency)," (3) "the strength of the evidence supporting the allegations of abuse," (4) "the risk that the parent will flee with the child," (5) "the possibility of less extreme solutions to the problem," and (6) "any harm that might result from the removal."). Moreover, *Wernecke* made clear that an officer can be on notice that exigent circumstances may not exist even when, as here, some *Gates* factors favor removal. *See Wernecke*, 591 F.3d at 399.

As discussed above, the evidence presented raises a serious question as to whether exigent circumstances existed in this case. The standards enunciated in *Gates* (2008) and *Wernecke* (2009)

were sufficient to put Defendant Mejia on notice of the "essentials" for purposes of qualified immunity—that removing Plaintiffs' children without reason to believe that the children were in imminent danger of physical harm violated clearly established law. *Gates*, 537 F.3d at 438; *Wernecke*, 591 F.3d at 400–401. Accordingly, Defendant Mejia is not entitled to qualified immunity.

## II.    Other Claims

In addition to the substantive and procedural due process claims discussed above, Plaintiffs' complaint alleges that after the events of January 6 and 7, 2022, Defendant "maliciously attempted to keep the case open by fabricating information so that the Court would order the parents to enroll in family[-]based services based on 'domestic violence.'" (Doc. No. 1, at ¶ 14.) The complaint also claims that DFPS failed to erase the allegations of abuse related to January 6 and 7 from its case file following the state court's denial of DFP's motion to initiate family-based protective services. *Id.* Defendant Mejia moves to dismiss these two allegations for failure to state a claim for relief. (Doc. No. 33, at 18.)

A complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts which, taken as true, state a claim that is plausible on its face and thus does not raise a right to relief above the speculative level. *See Montoya v. FedEx Ground Packaging Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also* Fed. R. Civ. P. 8 (To state a plausible claim for relief, a pleading must contain (1) "a short and plain statement of the grounds for the court's jurisdiction," (2) "a short and plain statement of the claim showing that the pleader is entitled to relief," and (3) "a demand for the relief sought"). A claim has factual plausibility when the pleaded factual content allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged. *See Hershey*

*v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement. *Iqbal*, 556 U.S. at 678.

Here, Plaintiffs claim that Defendant Mejia "fabricated" allegations of domestic violence in an attempt to subject Plaintiffs to a family-based services plan and failed to erase information about the January 6 incident from their case file. However, Plaintiffs do not provide any facts to support these allegations. Nor do they identify which legal theory would entitle them to relief for the conduct alleged. Accordingly, with respect to these two allegations, Plaintiffs' complaint fails to allege sufficient facts to state a colorable claim and should be dismissed. *See Montoya*, 614 F.3d at 149; *Iqbal*, 556 U.S. at 678.

## CONCLUSION

For the reasons stated herein, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 33) be **GRANTED-IN-PART** and **DENIED-IN-PART.** The court **RECOMMENDS** that Defendant's motion be **GRANTED** on grounds of qualified immunity as to Plaintiffs' Fourteenth Amendment substantive due process claim and that that claim be dismissed with prejudice. The court **RECOMMENDS** that Defendant's motion (Doc. No. 33) be **DENIED** as to Plaintiffs' procedural due process claim. Finally, the court **RECOMMENDS** that Defendant's motion (Doc. No. 33) be granted with respect to Plaintiffs' claim regarding family-based services for failure to state a claim, and that any such claim be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's report and recommendation, any party may serve and file written objections to the findings and recommendations contained in the report and recommendation. A party's failure to file written objections to the findings, conclusions and recommendations contained in this report and recommendation within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 11th day of March, 2024.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE