UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

No. 6:23-cv-00096

**Alexandra Wood and Jordan Wright,**
*Plaintiffs,*

v.

**Priscilla Mejia,**
*Defendant.*

# ORDER

Plaintiffs Alexandra Wood and Jordan Wright ("plaintiffs") filed this civil rights action pursuant to 42 U.S.C. § 1983. Doc. 1. The case was referred to United States Magistrate Judge John D. Love pursuant to 28 U.S.C. § 636(b)(1) for all pretrial purposes, including proposed findings of fact and recommendations for disposition. Doc. 3. On March 11, 2024, the magistrate judge issued a report recommending that defendant Priscilla Mejia's motion for summary judgment (Doc. 33) be denied-in-part and granted-in-part. Docs. 39 (sealed), 40 (unsealed). Defendant filed objections to the report and recommendation. Doc. 41. Plaintiffs filed a response in opposition to defendant's objections. Doc. 42.

## I. Factual Background

On January 6, 2022, defendant Priscilla Mejia, then a child protective services investigator with the Texas Department of Family and Protective Services (DFPS), removed plaintiffs' two minor children, KRW and EMW, from plaintiffs' custody without parental consent or a court order. Doc. 25. The removal occurred while plaintiffs' then two-year-old son, KRW, was admitted to the hospital and being treated for accidental ingestion of methadone. Doc. 33-1 at 11; Doc. 35-2 at 3. According to the medical records and plaintiffs' statements, KRW accidentally ingested some of his father's prescription methadone while his father, Jordan Wright, was preparing his prescribed dose and became momentarily distracted. Doc. 33-1 at 16; Doc. 35-2 at 1.

Plaintiffs immediately took KRW to the emergency room for evaluation. Doc. 33-1 at 16–17. While at the emergency room, a urinalysis drug test conducted on KRW returned positive results for cannabinoids, tricyclic (TCA) antidepressant, and methadone. *Id.* at 20. The medical diagnosis included an "acute opiate overdose" and "poisoning by cannabis derivative." *Id.* at 22. The doctor noted that "critical care was necessary to treat or prevent imminent or life-threatening deterioration of the following conditions[:] Toxidrome, cardiac failure, circulatory failure and respiratory failure." *Id.* at 19. The E.R. physician also observed, "The fact that this child was placed in such a situation requires immediate intervention by the appropriate state agencies, such as child protective services, and law enforcement." *Id.* at 10.

As a result, DFPS was contacted, and defendant Mejia was assigned to the case. *Id.* at 15. KRW was transferred to the main hospital for admission and continued observation with his mother, Alexandra Wood, by his side. Doc. 35-2 at 2–3. His father, plaintiff Wright, took EMW to his brother and sister-in-law's house for the night so that plaintiffs could stay overnight at the hospital with KRW. Doc. 35-3 at 3.

At the hospital, defendant Mejia met in person with plaintiff Wood, but plaintiff Wright was transporting EMW to his brother's house at the time of the initial meeting. Doc. 33-1 at 44. During the meeting with defendant Mejia, Wood admitted that she and Wright had a previous negative CPS history due to drug abuse but denied any recent drug use. *Id.*; Doc. 35-2 at 3. Wood also informed defendant Mejia that she had given KRW Benadryl for a cold. *Id.* Wood indicated that she was not present in the room when KRW ingested the medicine, and that Wright would be able to give better details about what happened when he returned from dropping off EMW. Doc. 33-1 at 44. Defendant Mejia proceeded to explain that a safety plan would need to be in place, and Wood gave her the name of her sister-in-law Anveya Wright, who could keep the children if needed. *Id.* Ultimately, defendant Mejia determined that the paternal brother and sister-in-law would not be a suitable placement

due to the criminal record and prior negative CPS history of the brother, Jacob Wright. *Id.* at 45. Defendant asked Anveya Wright if she would be willing to relocate to plaintiff Wood's home to care for the children, to which Ms. Wright expressed hesitation. *Id.* at 46. Defendant informed Ms. Wright that due to Jacob Wright's history the children could not stay in her home. And Ms. Wright stated that she understood.[1]

KRW and EMW were removed from parental custody at some point between approximately 9:00 P.M. and 10:15 P.M. on Thursday January 6, 2022. *Id.* at 4, 9, 23; Doc. 35-2 at 3. Soon after removal of custody, plaintiffs were forced to leave the hospital by threat of criminal trespass. Doc. 33-1 at 46; Doc. 35-2 at 3–4. The next day, Friday January 7, 2022, at between approximately 12:00 P.M. and 1:27 P.M., defendant Mejia was present with KRW for discharge from the hospital and thereafter transported KRW and EMW to their foster placement. Doc. 33-1 at 50–51. At 1:54 P.M., defendant Mejia received an email from the Henderson County Assistant County Attorney stating that the judge had denied the request for an emergency protection order but had directed DFPS to file an order to participate in family-based safety services. *Id.* at 51. KRW and EMW were returned to their parents' custody on January 7, 2022, at 4:45 P.M—approximately 20 hours after they had been removed. *Id.*

Plaintiffs filed this action asserting that defendant Mejia violated their Fourteenth Amendment rights to substantive and procedural due process. Doc. 1. Defendant Mejia contends that she is entitled to qualified immunity on plaintiffs' claims. Doc. 33.

**II. Procedural Background**

Upon review of the record and evidence presented, the magistrate judge concluded that defendant Mejia's motion for summary judgment (Doc. 33) should be granted as to plaintiffs' Fourteenth Amendment substantive due process claim, granted as

---

[1] Plaintiffs do not dispute defendant's account of her interactions with plaintiffs' sister-in-law, who did not provide a sworn account. But plaintiff's brother Jacob Wright has provided a sworn account of his conversations with defendant (Doc. 35-4), even though defendant's records only indicate that she interacted with Anveya Wright.

to plaintiffs' family-based services claim for failure to state a claim, and denied as to plaintiffs' procedural due process claim. Doc. 40.

As an initial matter, neither party objected to the magistrate judge's conclusion that plaintiffs' substantive due process claim should be dismissed with prejudice. Doc. 41 at 3. Similarly, neither party objected to the magistrate judge's recommendation that plaintiffs' claim regarding family-based services should be dismissed with prejudice for failure to state a claim. *Id.* at 8. The court therefore reviews these conclusions only for clear error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1420 (5th Cir. 1996) (en banc).

Having reviewed the magistrate judge's report (Doc. 40) and being satisfied that it contains no clear error with respect to plaintiffs' substantive due process and family-based services claims, the court accepts these findings and recommendations. Plaintiffs' Fourteenth Amendment substantive due process and family-based services claims are dismissed with prejudice.

As to the magistrate judge's findings and recommendations on plaintiffs' procedural due process claim, defendant Mejia has raised several objections. Doc. 41 at 3–8. The court reviews the objected-to portions of a report and recommendation de novo. 28 U.S.C. § 636(b)(1). In conducting a de novo review, the court examines the entire record and makes an independent assessment under the law. *Douglass*, 79 F.3d at 1430. For the reasons given below, the court sustains defendant's objections to the magistrate judge's report (Doc. 40) and finds that defendant's motion for summary judgment should be granted. Doc. 33.

**III. Analysis**

Summary judgment is appropriate where the record, taken as a whole, "together with the affidavits, if any, show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). The doctrine of "qualified immunity" protects government officials from "liability for civil damages insofar as their conduct does not violate 'clearly

established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982). To overcome a qualified immunity defense, a plaintiff must allege (1) a violation of a constitutional right that was (2) "clearly established at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).

On summary judgment, once a defendant invokes qualified immunity, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (internal citation omitted). Thus, although the court draws all factual inferences in favor of the non-movant, once the issue of qualified immunity is raised, the non-movant (i.e. the plaintiff in this case) bears the burden of rebutting the defense. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). When properly applied, qualified immunity "protects all but the plainly incompetent and those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. at 743.

It is well-established in the Fifth Circuit that the procedural due process requirements of the Fourth and Fourteenth Amendments prohibit a state from seizing "a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 429 (5th Cir. 2008) (citation omitted). So there is no dispute that a constitutional right is implicated in plaintiffs' allegations. But to overcome qualified immunity, plaintiffs must show that defendant's conduct was "objectively unreasonable in light of clearly established law." *Wernecke v. Garcia*, 591 F.3d 386, 391 (5th Cir. 2009). The Fifth Circuit considers an official's conduct objectively reasonable "unless all reasonable officials in defendant's circumstances would have then known that the conduct violated the Constitution." *Gates*, 537 F.3d at 419.

Defendant is thus entitled to qualified immunity unless there is evidence to show that no reasonable official in defendant's position would have believed exigent circumstances justified removal of plaintiffs' children.

Exigent circumstances exist when, based on the totality of the circumstances, "there is reasonable cause to believe" that the children are in imminent danger if they remain with the parents. *Id.* "This is a flexible inquiry that considers all of the facts and circumstances with no one factor being dispositive." *Id.* In assessing whether exigent circumstances justifying removal exist, the court considers several nonexclusive factors, including: (1) "whether there was time to obtain a court order," (2) "the nature of the abuse (its severity, duration, and frequency)," (3) "the strength of the evidence supporting the allegations of abuse," (4) "the risk that the parent will flee with the child," (5) "the possibility of less extreme solutions to the problem," and (6) "any harm that might result from the removal." *Id.*; *see also Wernecke*, 591 F.3d at 398.

In *Pate v. Harbers*, the Fifth Circuit affirmed a district court's finding that exigent circumstances justifying removal existed when there was "significant evidence of illicit drug possession and use" by the caregiver. 667 F. App'x 487 (5th Cir. 2016) (unpublished).

In *Banks v. Herbrich*, the Fifth Circuit endorsed the reasoning in *Pate* but found that an uncorroborated, anonymous report of illicit drug use, contradicted by considerable evidence including a recent drug test, was not sufficient evidence of illicit drug use to justify removal. 90 F. 4th 407, 414-15 (5th Cir. 2024).

Here, the significant evidence of illicit drug use came in the form of a test showing that the plaintiffs' two-year-old child had ingested an illicit drug and ingested at least one other controlled substance. Doc. 33-1 at 22.

That evidence came to light immediately after plaintiffs' son had suffered an acute drug overdose from an accidental ingestion of methadone. Every parent knows that accidents happen, even under the best of care. And plaintiffs are to be commended for seeking immediate medical treatment. But not all accidents are alike. A two-year-old child gaining access to a potentially lethal dosage of methadone is equivalent to a child accidentally wounding himself with a loaded gun. That accident alone is enough to raise the gravest of concerns about the child's safety in the home.

Medical records raised the possibility that the tricyclic antidepressant test result might have been caused by the ingestion of other drugs, but there is no evidence whatsoever to suggest that the cannabis screening was a false positive, aside from plaintiffs' own adamant denials. *Id;* Doc. 35 at 3.

Both plaintiffs had documented histories of past marijuana use. *Id.* at 125. Past drug use is not itself dispositive, but it adds credibility to a drug test, especially in the absence of any medical reason to doubt its accuracy. Plaintiffs' emphatic insistence that the positive test result for cannabis was impossible raises reasonable doubts about their honesty, at least as much as it raises doubts about the accuracy of a test administered by disinterested medical professionals. And finally, plaintiffs both tested positive for recent marijuana use. *Id.* at 56. Though these recent test results were not available to defendant at the time of custody removal, they further confirm defendant's judgment at the time that plaintiffs' denials of recent drug use were not credible.

The following circumstances at the time of removal are undisputed: A two-year-old child had suffered a nearly fatal drug overdose. That child was not old enough to give his own account of how the accident had happened, or even to comprehend the grave danger to which he had been subjected. And the best evidence available, from the child's drug testing, indicated that his parents were not being truthful with the social worker responsible for ensuring the child's safety. In this fraught situation, it was not objectively unreasonable for defendant to conclude that exigent circumstances justified immediate removal of plaintiffs' children.

But from an abundance of caution, the court will briefly consider the other factors the Fifth Circuit has identified.

(1) *Available time to obtain a court order.*

Defendant was assigned to the case after business hours on January 6, 2022. *Id.* at 44. Defendant made the decision to remove the children at around 10:00 PM. There is no indication of any delay in obtaining a court order, which was issued the following afternoon.

*Id.* at 51. The children were returned to their parents within 20 hours of removal. *Id.*

(2) *Availability of less extreme solutions to the problem.*

Undisputed evidence shows that defendant made considerable efforts to place the children with qualified family members. Plaintiffs left their seven-month-old daughter with her paternal uncle. Upon investigating whether this home would be safe for plaintiffs' children, defendant learned that the paternal uncle has a criminal record for assault with a deadly weapon and indecent exposure. *Id.* at 45. The paternal uncle also had a negative history with child protective services for failure to provide adequate supervision of a four-year old who was subject to sexual abuse. *Id.* Plaintiffs did not provide defendant with an appropriate alternative caregiver.

Plaintiffs also argue that there was no danger in leaving the child in the custody of his parents while they remained at the hospital. Doc. 35 at 11. It is certainly true that there was no imminent risk of harm to the child while he remained in the hospital. But this argument overlooks two difficulties.

First, it overlooks the status of plaintiffs' other child, who was then in the care of her paternal uncle. The paternal uncle's past history raised serious concerns about the child's safety in his care.

Second, it was unlikely that a court order could be obtained before KRW was released. Doctors recommended keeping KRW for observation overnight. Doc. 33 at 10. The child was ready to be released at 9:00 AM. *Id.* at 50. A court denied the order for emergency protection at 1:54 PM. *Id* at 51.

It may have been advisable for defendant to delay removing KRW while he remained in the hospital. But once a case-worker has determined that circumstances justify removing a child from his parents' custody, there is no clear benefit in temporarily delaying the decision until the child is ready to be discharged from the hospital. And the delay in promptly informing the parents, once the decision to remove had been reached, could have predictable negative consequences – such as making the decision seem arbitrary and the social worker seem untrustworthy.

Finally, the relevant question here is not whether a reasonable alternative solution existed; it is whether that reasonable alternative made the defendant's actual conduct objectively unreasonable.

(3) *Risk that the parents will flee with the child.*

There is no evidence in the record to suggest a risk that the parents might flee with the children. At the same time, it is obvious that there can be serious consequences when a two-year old has an accidental methadone overdose and simultaneously tests positive for two other controlled substances. Given plaintiffs' prior criminal history, and their failure to provide a credible explanation for the drug test results, the risk of flight could not be ruled out entirely.

(4) *Harm that might result from removal.*

Plaintiffs have not alleged any permanent harm or trauma suffered by their children as a result of being removed from their custody for 20 hours.

The four factors discussed above do not alter the court's analysis in either direction. The two operative factors were the nature of the harm the child had suffered and the quality of the evidence supporting that harm. The nature of the harm was negligent exposure to a combination of illicit and controlled substances. Unlike other forms of neglect or abuse, where the harm might accumulate for weeks or longer before resulting in irreversible damage to the child, exposure to dangerous drugs can be fatal in a mere moment. And unlike the anonymous reports often at issue in removal cases, the evidence here was a medical test administered by professionals. *See Banks v. Herbrich*, 90 F. 4th at 414-15. It was not the sort of evidence that a responsible public official should treat skeptically until confirmed by further investigation.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment (Doc. 33) is granted.

*So ordered by the court on June 25, 2024.*

_____
J. CAMPBELL BARKER
United States District Judge